EARL MILLIKIN, INC., Respondent, v. ALLEN and wife, Appellants.

*October 30—November 26, 1963.*

498

For the appellants there was a brief and oral argument by *Philip Weinberg* of Milwaukee.

For the respondent there was a brief and oral argument by *Harry W. Theuerkauf* of Milwaukee.

WILKIE, J. The principal issue on this appeal is whether, under the terms of the Hooker-Allen lease, Hooker would have been obliged to begin paying rent as of June 1, 1960, if water for human consumption was supplied by some other means than the well or the city water main.

There is no question that Millikin did not perform his construction contract on time, that time was of the essence under that contract, that Hooker delayed his occupancy for

three months until September 1, 1960, and that Allen's loss of rentals due to the delayed occupancy was $3,900. But the question is whether Allen could have obliged Hooker to take possession on June 1, 1960, under the lease even if Millikin had completed the building according to the plans and specifications.

Allen promised to provide a water supply appropriate for the use of this building as a warehouse and retail store. The covenant of possession implies not only that the tenant will be able to physically occupy the premises on the date of delivery of possession, but that he will also be able to use the premises for its intended purpose.[1] Obviously, if the building is to be utilized as a store, it must contain drinking-water facilities for the general public and employees and a water supply to permit employees to wash. In addition to the general covenant of possession, the lease incorporated the plans and specifications for construction of the building. The party responsible for construction, Allen being such party in his relationship with Hooker, was to provide "water service to the building." Obviously this provision looked toward the actual delivery of the water supply to the building rather than only to construction of the mechanical conduit from the water supply to the building. Thus Allen had an obligation to provide water for human consumption for the building. Moreover, the lease specified the mode of delivery. The plans and specifications set forth two water-delivery systems. One, from the city water main to the building, and the other, from the well to the building. The lease contained no reference to delivery of water for human consumption by means of bottled water.

Through no fault of his own, Millikin could not provide for a source of water for human consumption at the building by means of a connection to the city water system by June 1,

[1] *Pines v. Perssion* (1961), 14 Wis. (2d) 590, 111 N. W. (2d) 409.

1960. It is equally clear that if Millikin had followed the plans and specifications and supplied water for human consumption at the building by means of a connection with the well on the premises, this would have been in violation of the provisions of secs. H 55.01 (1)[2] and H 55.04 (2) (e),[3] 2 Wis. Adm. Code, which flatly prohibit the use of a water well for human-consumption purposes where such well is less than 10 feet from a free water drain. This well was located five and one-half feet from the free water drain.

The purpose of the regulations relating to the location of wells is set forth in ch. H 55, 2 Wis. Adm. Code, at page 188:

"Pure drinking water is the goal embodied in chapter H 55, well construction and pump installation. The development of ground-water sources to produce safe water is the primary reason for the administration of this law by the state board of health. It is in the interest of protection from such diseases as typhoid, dysentery and other intestinal sicknesses that all well drillers and all pump installers are by law required to provide the best available protection against pollution of wells. . . ."

These provisions seek to protect persons against diseases caused by contaminated water. Locating a well a substantial

---

[2] "H 55.01 SCOPE OF THE CODE. (1) *Applicability*. The provisions of the regulations governing well construction and pump installation shall apply to all new or reconstructed wells intended or used for supplying water for human consumption, including those used in the production and preparation of food and food products, excepting those for public utility and institutional water supplies, cooperative water supplies serving ten or more premises of mixed ownership, and new, additional or reconstructed wells on one property, whose capacity and rate of pumping, either singly or in the aggregate, are in excess of 100,000 gallons per day."

[3] "H 55.04 LOCATION. (1) *General*. Every well shall be located in keeping with the following principles: . . . (2) *Relation to Pollution Sources*. Minimum distances between wells and sources of contamination shall be maintained as follows: . . . (e) Independent clear water drain, downspout, cistern or similar unit—10 feet. . . ."

distance from the free water drain reduces the chance that ground water will seep into the mouth of the well, without passing through a natural filtration process.

An occupancy permit could not have been obtained assuming this alternative method of supplying water for human consumption on the premises.

Therefore, we conclude that Hooker could have refused to take possession on June 1, 1960, and relieved himself of liability for rent by demonstrating that Allen failed to perform his promise to provide an adequate water supply by *either one of the two prescribed means of delivery.*

There is no evidence in the record that Hooker at any time prior to June 1, 1960, agreed to accept any alternative mode of delivery other than those specified by the terms of the lease. Therefore, because Allen could not have compelled Hooker to pay rent, as a matter of law, and because there is no evidence that Hooker waived any of his rights under the original lease, and because Allen offered no other evidence of his loss of an expectation interest other than by means of his relationship with Hooker, we conclude that Allen did not demonstrate to a reasonable certainty [4] that the loss of rent value was occasioned by Millikin's breach.

A further issue is presented on this appeal, to wit: Should Allen be permitted to offset from the judgment, nominal damages sustained as a result of Millikin's failure to complete construction within the agreed-upon time?

Although we have held that a party may receive nominal damages flowing from a breach, in the absence of proof of actual damages,[5] we will not reverse a judgment solely be-

---

[4] *De Sombre v. Bickel* (1963), 18 Wis. (2d) 390, 118 N. W. (2d) 868.

[5] *Rhinelander Paper Co. v. Bushman* (1923), 181 Wis. 421, 195 N. W. 325. *Anderson v. Savoy* (1910), 142 Wis. 127, 124 N. W. 1053.

504

cause of the failure of the trial court to permit such recovery.[6]

The trial court apparently reflected his realization of the nominal-damages rule by denying costs.

*By the Court.*—Judgment affirmed.

[6] *Hibbard v. Western Union Telegraph Co.* (1873), 33 Wis. 558.